BLANK ROME LLP
A Pennsylvania LLP
STEPHEN M. ORLOFSKY, ESQUIRE
New Jersey Resident Partner
ELAINE S. SOLOMON, ESQUIRE
JAMES J. QUINLAN, ESQUIRE
301 Carnegie Center, 3rd Floor
Princeton, NJ 08540
Phone:  (609) 750-7707
Fax:  (609) 897-7395
E-Mail:  SOLOMON@BLANKROME.COM
         QUINLAN@BLANKROME.COM

*Attorneys for Plaintiff*
*American Airlines, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| AMERICAN AIRLINES, INC. | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : CA: |
| | : |
| THE PORT AUTHORITY OF NEW YORK | : |
| AND NEW JERSEY, PAUL J. SCARIANO, | : COMPLAINT AND JURY DEMAND |
| INC. AND ABC CORPORATIONS 1-5 and | : |
| JOHN DOES 1-10 | : |
| | : |
| | : |
| Defendants. | : |
| | : |

Plaintiff American Airlines, Inc. (hereafter "American"), by and through its attorneys

Blank Rome LLP, by way of Complaint against Defendants, alleges as follows:

### THE PARTIES

1.      Plaintiff American Airlines, Inc. is a Delaware corporation with its principal place

of business in Fort Worth, Texas.  At all relevant times, American was engaged in the business

of providing scheduled air transportation services at LaGuardia Airport ("LGA").

2.     At all relevant times, American was the lessee of certain space, premises, facilities, rights, licenses and privileges at LGA, including in Hanger 5 at LGA, and, as part of its business, was using said space to provide scheduled air transportation services.

3.     Defendant the Port Authority of New York and New Jersey (the "Port Authority"), is a body corporate and politic established by Compact between the States of New York and New Jersey with the consent of Congress of the United States of America with offices located at 225 Park Avenue South, Manhattan, New York.  At all relevant times, the Port Authority leased LaGuardia Airport ("LGA") from New York City and served as LGA's operator and was the lessor of space to American, including Hanger 5 at LGA.

4.     Defendant Paul J. Scariano, Inc. (hereafter "PJS") is a New York corporation, with its principal place of business at 916 Old Nepperhan Avenue, Yonkers, NY  10703.  At all relevant times, PJS was providing construction services at LGA pursuant to a contract between the Port Authority and PJS.

5.     At all relevant times, ABC Corporations 1-5 are fictitious entities that owed a duty to the Plaintiff, and who breached that duty and caused Plaintiff significant property damage as generally set forth in this Complaint.  Plaintiff is currently unaware of the identity and potential liability of ABC Corporations 1-5.

6.     At all relevant times, John and/or Jane Does 1-5 are fictitious individual parties that owed a duty to the Plaintiff, and who breached that duty and caused Plaintiff significant property damage as generally set forth in this Complaint.  Plaintiff is currently unaware of the identity and potential liability of John and/or Jane Does 1-5.

## JURISDICTION

7.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.  This is an action between parties of diverse citizenship with an amount in controversy that exceeds $75,000.00.

8.     The Port Authority of New York and New Jersey is bi-state governmental entity created by state compact and controlled equally by the States of New York and the New Jersey. In that regard, the Port Authority owns, leases, and/or possesses and/or controls real property located in both said states and the shared navigable waters between and adjacent to said states, and it conducts operations upon said real property and said navigable waters.

9.     The Court has personal jurisdiction over the Port Authority of New York and New Jersey in this matter through a statute entitled, "Interstate and Port Authorities and Commissions, Port Authority of New York and New Jersey, Compact of April 30, 1921, Suits Against Port Authority", as codified at N.J.S.A. § 32:1-157 and 171 (2013), in which the State of New Jersey waived sovereign immunity and consented to suits, actions, or proceedings of any for, or nature at law, in equity or otherwise against the Port Authority of New York and New Jersey in the State of New Jersey.

10.     The Court also has personal jurisdiction in this matter pursuant to N.J.S.A § 32:1-169 (2013) because: (a) Plaintiff is an entity engaged in the business of scheduled transportation by aircraft; (b) Plaintiff has brought this breach of contract claim against the Port Authority with respect to the enforcement of a written contract for use or occupancy of space, premises or facilities located at LGA, which was formerly known as the Municipal Airport, located in the Borough of Queens, City and State of New York; (c) the Lease Agreement at issue was executed

3

on or after January 1, 1953 between the Port Authority and Plaintiff; and (d) the instant claim is being brought within two (2) years of the Port Authority's said breach of the Lease Agreement.

11.     The Court has personal jurisdiction over PJS because it filed for and was permitted by the State of New Jersey to conduct business in New Jersey on October 10, 2000, and, as of the date of this filing, PJS's website, located at www.pauljscariano.com, represents that PJS conducts business in New Jersey and has done so for seventeen (17) years.  PJS also engages a registered agent for service of process in Princeton, New Jersey.

12.     Pursuant to 28 U.S.C. § 1392,  venue is proper in this Court with respect to the Port Authority because the vicinage of Newark of the Federal District Court for the District of New Jersey, is located within Essex County, New Jersey, which is expressly included as part of the "Port District of New York," and thus, is a venue that the State of New Jersey has consented to for lawsuits against the Port Authority pursuant to a statute entitled "Interstate and Port Authorities and Commissions, Port Authority of New York and New Jersey, Compact of April 30, 1921, Port District, Legal Name, Boundaries", as codified at N.J.S.A. Sect. 32:1-3 and 171 (2013).

13.     Pursuant to 28 U.S.C. § 1392, venue is proper in this Court with respect to PJS because, based on information and belief, PJS has conducted business in the State of New Jersey and within the Vicinage of Newark of the federal court for the District of New Jersey.

## FACTS

14.     At all relevant times, the Port Authority leased certain premises, facilities, improvements, appurtenances, equipment, services, rights, licenses and privileges at LGA to American, including, but not limited to those located in Hangar 5, pursuant to the Lease Agreement between the Port Authority and American ("Lease Agreement").

15.     American's leased space under the Lease Agreement includes exclusive "Hangar Space" as defined in the Lease Agreement, including but not limited to Hangar 5.

16.     Hangar 5 is a space designed for and utilized by American to store and maintain commercial passenger airplanes, along with associated offices and stores.

17.     At all relevant times, the Port Authority owned, leased, operated, maintained and/or controlled certain facilities, equipment, services and appurtenances for Hanger 5, including but not limited to water piping, hydrants, fire suppression systems, pump stations and associated systems.

18.     With respect to the damages at issue in this case, at all relevant times, the Port Authority owned, leased, operated, maintained and/or controlled the pump stations, fire hydrants, water mains, water piping, fire suppression systems  and associated systems, pipes, appurtenances and equipment, which were connected to and supplied water to the Hangar 5 fire suppression systems (which include a fire sprinkler deluge system and standpipe system).

19.     Upon information and belief, sometime before September 20, 2012, the Port Authority and PJS entered into a contract for PJS to perform certain construction and other related services in connection with the Port Authority's fire suppression systems at LGA.  Those services included but were not limited to:  (a) removing and replacing certain water piping, fire hydrants, fire suppression systems and related work,  from water mains to airport buildings (including Hangar 5); and (b) flushing, testing, and inspecting all such pipes and systems.

20.     The Port Authority's pump station, hydrants,  water mains and water piping systems supply water to two Hangar 5 fire suppression systems:  (a) a standpipe system; and (b) a fire sprinkler deluge system.

21.     Upon information and belief, during the evening of September 20, 2012, and the morning hours of September 21, 2012, the Port Authority and/or its agents, employees, representatives and/or contractors (including PJS), employed the Port Authority's fire pump system to build up significant water pressure in order to flush and/or test the new fire hydrants, water piping and systems that had been installed/replaced pursuant to the contract between PJS and the Port Authority.  Specifically, this flushing took place with respect to the high pressure yard loop system between Terminals B and C at LGA.

22.     The manner in which the high pressure water systems flushing and/or testing was done by the Port Authority and/or its agents, employees, representatives and/or contractors (including PJS) was improper and/or done without taking appropriate precautions.

23.     The flushing and/or testing was conducted by PJS and/or the Port Authority without any timely notice to American of the date and time that such flushing and/or testing would be taking place.  Had American received such timely notice, it would have been able to take precautionary steps that would have avoided the resulting damage to its two Hangar 5 fire suppression systems (i.e. the standpipe and fire sprinkler deluge systems).

24.     No tenant coordination plan was established for the flushing and/or testing event so that tenants could make staff available during the event or provide fire watch while branch systems were shut off and/or otherwise isolated.

25.     No tenant-Port Authority communication plan was established for the event so that tenants could communicate problems to the Port Authority and/or PJS and have them addressed.

26.     Proper and adequate system preparation steps and precautions were not taken. Such precautions should have included (but are not limited to) shutting off service valves and/or

otherwise isolating or bypassing branch lines so that flushing and/or testing of the system would not cause damage to American's two Hangar 5 fire suppression systems.

27.     The manner in which the flushing and/or testing was conducted placed unexpected, extraordinary and unnecessary pressure on certain fire suppression systems, including American's Hangar 5 standpipe system and the fire sprinkler deluge system.

28.     The actions and failures to act referenced above by the Port Authority and/or its agents, employees, representatives and/or contractors (including PJS), directly resulted in one or more underground pipe breaks, leaks and/or failures, including but not limited to breaks, leaks and/or failures in both of American's Hangar 5 fire suppression systems. (The facts set forth in the preceding paragraphs are hereafter collectively referred to as "the Incident").

29.     The above-referenced breaks, leaks and/or failures in the Hangar 5 standpipe and fire sprinkler deluge systems did not exist prior to the date of the subject Incident.  Rather, they were caused by the subject Incident.

30.     Prior to the Incident, the Port Authority had not advised American that any leaks, breaks, failures and/or abnormal water pressure had been detected, nor did American have any other indication that there were pre-existing leaks, breaks, failures and/or abnormal pressure in the two Hangar 5 fire suppression systems.

31.     As a result of Defendants' actions and failures to act referenced above, and the resulting Hangar 5 fire suppression systems failures, the Port Authority's pump station continued pumping large amounts of water through the systems, releasing a large volume of water into American's Hangar 5 leased space.

32.     As a result of Defendants' actions and failures to act referenced above, Hanger 5 heavily flooded, resulting in damages to American's Hangar 5 leased space and to American's

non-real property. Such damages included, but were not limited to, damage to certain machinery located in the boiler room (which filled with four to five feet of water).

33. The pump station, fire hydrants, water mains, water piping and associated systems, pipes, appurtenances and equipment causing the uncontrolled water flooding in Hangar 5 were the Port Authority's, not American's, and the street valves had to be shut off by the Port Authority – which did not take place for several hours, causing further flooding and damages to American. The delay and resulting damages was also caused by the Port Authority's and/or PJS's failure to have a tenant coordination plan and tenant communication plan in place for the flushing and/or testing event, as referenced in preceding paragraphs.

34. As a further result of Defendants' actions and failures to act referenced above, American's two Hangar 5 fire suppression systems were damaged, rendered inoperable, and have not been usable for Hangar 5 fire protection services since the date of the subject flushing and/or testing on September 20-21, 2012.

35. Since the date of the Incident (September 20-21, 2012), the Port Authority and/or its agents, employees, representatives and/or contractors (including PJS), have had knowledge of the damages and conditions that the Port Authority and/or its agents, employees, representatives and/or contractors (including PJS) caused to the two Hangar 5 fire suppression systems, due to the improperly conducted flushing and/or testing described above.

36. Because of the Hangar 5 standpipe and fire sprinkler deluge systems failures caused by Defendants' conduct, American has had to engage fire watch services, whereby Hanger 5 has (since September 21, 2012) been under 24 hour in-person monitoring to alert fire fighting authorities in the event of a fire within Hanger 5 in order to protect American's

personnel and property including, but not limited to, the commercial passenger airplanes that American was storing in Hanger 5, equipment, stores and offices.

37.     Upon information and belief, due to the extent of the damage to the Hangar 5 standpipe and fire sprinkler deluge systems caused by Defendants' actions, repairs of the systems are not advisable and/or the systems cannot be returned to safe, operable conditions.

38.     As a direct result of Defendants' actions, American has already suffered and will in the future suffer inconveniences, as well as incur substantial expenses and damages, including the following:  (a) water damage and clean-up expenses to American's building, equipment, contents and personal property in Hangar 5; (b) expenses for investigation and analysis of the damages caused to the two Hangar 5 fire suppression systems, and any possible remedial actions; (c) expenses for spot-repair and replacement in connection with the two Hangar 5 fire suppression systems; (d) payment for 24 hour in-person Hangar 5 fire watch services totaling more than $500,000.00 to date; (e) significant expenses to either repair the Hangar 5 fire suppression systems affected by Defendants' conduct if the Port Authority and/or PJS does not do so, or to shut down the existing fire suppression systems and replace them with new systems; and (f)  other miscellaneous costs and damages sustained and/or to be incurred in the future. (The foregoing shall hereafter be referenced as "Damages")

## COUNT I – BREACH OF CONTRACT

## PLAINTIFF V. PORT AUTHORITY

39.     Plaintiff incorporates by reference the previous allegations as if set forth fully at length herein.

40.     At all relevant times, the pump stations, hydrants, water mains, water piping, and associated systems, pipes,  appurtenances and equipment (including but not limited to the fire

suppression systems that were tested and/or flushed on September 20-21 2012), were owned, leased, operated, maintained and/or controlled by the Port Authority and/or agents, employees, representatives and/or contractors of the Port Authority (including PJS).

41.    The Incident and resulting Damages were not the result of American's acts or failure to act. Indeed, upon happening of this Incident and to date, American has taken remedial actions to mitigate and prevent further damage.

42.    At all relevant times, the Lease Agreement required (both expressly and impliedly) the Port Authority to repair the damages and conditions resulting from the Incident so that American could avail itself of the promised benefits, uses, facilities, improvements, appurtenances, equipment and services under the Lease Agreement, including facilities, improvements, appurtenances, equipment, services and systems necessary for operation of the two Hangar 5 fire protection systems.

43.    Since the date of the Incident (September 20-21, 2012), the Port Authority and/or its agents, employees, representatives and/or contractors (including PJS), have had knowledge of the damages and conditions that the Port Authority and/or its agents, employees, representatives and/or contractors (including PJS) caused to the two Hangar 5 fire suppression systems, due to the  improperly conducted flushing and/or testing described above.

44.    Despite knowledge of such damages and conditions that the Port Authority and/or its agents, employees, representatives, and/or contractors (including PJS) caused to the two Hangar 5 fire suppression systems due to the improperly conducted flushing and/or testing described above, the Port Authority has not (since September 21, 2012) corrected the damages and conditions within and into American's Hangar 5 leased space, thereby breaching its

obligations, promises and covenants under the Lease Agreement with American in the following manner:

**Breach of Section 5(f) of Lease Agreement – Exclusive Hangar Space/Casualty Provision**

45.     Section 5 of the Lease Agreement is entitled "Exclusive Hangar Space". Subsection 5(f) of the Lease Agreement is entitled "Damage or Destruction of Buildings". Pursuant to Subsection 5(f) of the Lease Agreement, the Port Authority promised and covenanted to repair any and all damages that it and/or its agents caused or created within American's leased space.  Specifically, that "[i]f the Hangar Space shall be partially damaged by fire or other casualty but not rendered untenantable, the same shall be repaired with all proper speed at the expense of the Port Authority…."

46.     The Incident in question that was caused by the Port Authority and/or its agents, employees, representatives and/or contractors (including PJS) constitutes and/or caused a "casualty", and therefore, the Port Authority is required to repair the conditions and damages caused within and into the subject leased space.

47.     However, despite the Port Authority having knowledge of the casualty event and the resulting damages to American's two Hangar 5 fire suppression systems, the Port Authority has not to date repaired or replaced the damages and conditions caused with respect to the two Hangar 5 fire suppression systems.  Therefore, the Port Authority is in breach of Section 5(f) of the Lease Agreement with American.

48.     As a result, American has sustained the Damages set forth in paragraph 38 above.

**Breach of Section 2(a) of the Lease Agreement - Common Use of The Airport**

49.     Section 2(a) of the Lease Agreement is entitled "Common Use of the Airport". Pursuant to Subsection 2(a) of the Lease Agreement, American has the right to use of certain

11

Airport facilities and appurtenances in common with others, including but not limited to water facilities.

50.     As a result of the Port Authority's actions and failures to act referenced above and the resulting Hangar 5 fire suppression systems failures, American has been deprived of the use of certain Airport-wide facilities, including but not limited to water facilities (pump stations, hydrants, water mains and water piping). Therefore, the Port Authority is in violation of Section 2(a) of the Lease Agreement.

51.     As a result American has sustained the Damages set forth in paragraph 38 above.

**Breach of Section 3 of the Lease Agreement – Use of Airport and Facilities**

52.     Pursuant to Section 3 of the Lease Agreement, American has "the right to use the Airport, its facilities, improvements, appurtenances, equipment and services, in common with others...."

53.     As stated in Section 3 of the Lease Agreement, said right of use is so American can utilize full Airport privileges, including but not limited to the use of facilities, improvements, appurtenances, equipment and services for operation of its air transportation system, which includes American's use of the Hangar 5 leased space.

54.     Pursuant to Section 3, the Port Authority has an obligation to repair and/or replace the referenced water mains, water piping, fire suppression systems, damages and conditions caused by the Port Authority and/or its agents, employees, representatives, and/or contractors (including PJS), because the above-referenced damages to American's Hangar 5 fire suppression systems are substantially affecting American's right to use of Airport facilities, improvements, appurtenances, equipment and services, including but not limited to water services, and fire protection facilities, improvements, appurtenances, equipment and services.

55.    For the foregoing reasons, the Port Authority is in breach of Section 3 of the Lease Agreement.

56.    As a result, American has sustained the Damages set forth in paragraph 38 above.

**Breach of Section 20 of the Lease Agreement: Maintenance and Operation of Airport**

57.    Pursuant to Section 20 of the Lease Agreement (entitled "Maintenance and Operation of Airport"), the Port Authority covenanted and agreed to maintain and operate the Airport, appurtenances, facilities and services "now or hereafter connected therewith", free from obstruction "for the safe, convenient and proper use therefore by the Lessee…"

58.    As a result of the aforementioned conduct of the Port Authority and/or its agents, employees, representatives and/or contractors (including PJS), American's Hangar 5 fire suppression systems (including the standpipe and fire sprinkler deluge systems) were damaged.

59.    As a result, American has not been able to use Airport appurtenances, facilities and services (including but not limited to water facilities and services, pump stations,  hydrants, water mains, water piping and associated appurtenances, facilities and services) provided by the Port Authority necessary for use  of American's two Hangar 5 fire suppression systems.

60.     Further, despite the Port Authority having knowledge of the resulting damages to and conditions in American's two Hangar 5 fire suppression systems, the Port Authority has not to date repaired or replaced the damages and conditions that the Port Authority and/or its agents, employees, representatives, and/or contractors (including PJS) caused  to the two Hangar 5 fire suppression systems.

61.    Therefore, the Port Authority has breached its obligations under Section 20 of the Lease Agreement by not operating and maintaining the Airport appurtenances, facilities and services (including but not limited to water facilities and services, pump stations, hydrants, water

mains, water piping and associated appurtenances, facilities and services) necessary for American to use the two Hangar 5 fire suppression systems to protect personnel and property located therein

62. As a result, American has been deprived and continues to be deprived of the use of the two Hangar 5 fire suppression systems, causing the Damages set forth in paragraph 38 above.

### Breach of Section 24 of the Lease Agreement: Quiet Enjoyment

63. Under Section 24 of the Lease Agreement, entitled "Use of the Premises by the Lessee," the Port Authority promised and covenanted with American that American would be able to peaceably have and enjoy the leased premises and all rights and privileges of the Airport, its appurtenances, facilities and services.

64. Further, under Section 24 of the Lease Agreement, the Port Authority acknowledged and recognized that said quiet enjoyment of leased space was necessary for American's operation of its air transportation business at LGA, including aircraft operations in Hangar 5.

65. To fulfill its obligation under the Lease Agreement to provide American with quiet enjoyment of the leased space, the Port Authority is required to provide American with systems, facilities and appurtenances necessary to operate the two Hangar 5 fire protection systems that were connected to Port Authority pump stations, hydrants, water mains, water piping, appurtenances, facilities and services.

66. As a direct result of the aforementioned conduct of the Port Authority and/or its agents, employees, representatives and/or contractors (including PJS), American's quiet enjoyment of the leased premises has been adversely and unduly affected because of the

damages and conditions caused to the two Hangar 5 fire suppression systems (including the standpipe and fire sprinkler deluge systems).

67.     Further, despite the Port Authority having knowledge of the damages and conditions that the Port Authority and/or its agents, employees, representatives, and/or contractors (including PJS) caused to American's two Hangar 5 fire suppression systems, the Port Authority has not to date repaired or replaced the damages and conditions caused with respect to the two Hangar 5 fire suppression systems.  Therefore, the Port Authority is in breach of its quiet enjoyment obligations under Section 24 of the Lease Agreement.

68.     As a result, American has been deprived and continues to be deprived of the use of the two Hangar 5 fire suppression systems, causing the Damages set forth in paragraph 38 above.

**WHEREFORE**, Plaintiff demands judgment against the Defendant in an amount in excess of $75,000 in damages (including but not limited to damages set forth in paragraphs 27 through 30 above) together with fees, costs and any other relief this Court deems just and proper.

## COUNT II – IMPLIED BREACH OF WARRANTY

## PLAINTIFF V. THE PORT AUTHORITY

69.     Plaintiff incorporates by reference the previous allegations as if set forth fully at length herein.

70.     Under applicable law, all contracts, including but not limited to lease agreements, impose a duty on lessors to provide lessees with quiet enjoyment of the leased space.

71.     Pursuant to applicable law, as part of its obligation under the Lease Agreement to provide American with quiet enjoyment of said space, the Port Authority was required to provide American with certain facilities, appurtenances, and services necessary to operate the two

Hangar 5 fire protection systems that were connected to Port Authority pump stations, hydrants, water mains, water piping, appurtenances, facilities and services.  As a direct result of the aforementioned conduct of the Port Authority and/or  its agents, employees, representatives and/or contractors (including PJS), American's quiet enjoyment of the leased premises has been adversely and unduly affected because of the damages and conditions caused to the two Hangar 5 fire suppression systems (including the standpipe and fire sprinkler deluge systems).

72.     Further, despite the Port Authority having knowledge of the resulting damages and conditions that the Port Authority and/or its agents, employees, representatives, and/or contractors (including PJS) to American's two Hangar 5 fire suppression systems, the Port Authority has not to date repaired or replaced the damages and conditions caused with respect to the two Hangar 5 fire suppression systems.

73.     Such conduct by the Port Authority is in violation and continuing violation of American's right to quiet enjoyment of the leased space, and  in breach of the Lease Agreement pursuant to applicable law.

74.     As a result, American has been deprived and continues to be deprived of the use of the two Hangar 5 fire suppression systems, causing the Damages set forth in paragraph 38 above.

**WHEREFORE**, Plaintiff demands judgment against the Defendant in an amount in excess of $75,000 in damages, together with fees, costs and any other relief this Court deems just and proper.

## COUNT IV – NEGLIGENCE

### PLAINTIFF V. PAUL J. SCARIANO, INC.

75.     Plaintiff incorporates by reference the previous allegations as if set forth fully at length herein

76.     The water mains, water piping, fire hydrants, sprinkler systems, equipment, and fire suppression and water systems involved in the above-described flushing and/or testing on September 20-21, 2012, were repaired, replaced and/or constructed by PJS pursuant to its contract with the Port Authority, and/or were affected by repairs, replacement, construction and/or related work by PJS pursuant to its contract with the Port Authority described above.

77.     At all relevant times, the water mains, water piping, fire hydrants, sprinkler systems, equipment, and fire suppression and water systems involved in the above-described flushing and/or testing on September 20-21, 2012, were under the control of and/or were being used, operated, tested, flushed, inspected, augmented, manipulated and/or affected by PJS and/or agents, employees, representatives and/or subcontractors of PJS.

78.     In conducting the flushing and/or testing of the above-described water piping and fire systems, PJS owed American a duty to do so in a reasonable and workmanlike manner, especially because PJS had knowledge that flushing and/testing of the subject water piping and fire systems would affect property of Airport lessees, (including American), and if not properly performed, would cause damage to airline leased space and ancillary systems.

79.     The Incident and resulting damages and conditions were not the result of Plaintiff's act or failure to act.  Indeed, upon happening of this Incident and to date, Plaintiff has taken remedial actions to mitigate and prevent further damage.

80.     The above-described actions or failures to act by PJS and/or its agents, employees, representatives and/or subcontractors were negligent, said negligence consisting of the following acts and omissions:

(a)     Failure to perform contracted work in connection with the water mains, water piping, fire hydrants and fire suppression systems in a reasonable, appropriate and workmanlike fashion, and in accordance with applicable standards, practices and procedures;

(b)     failure to provide American with timely notice of the date and time when the subject flushing and/or testing would be taking place, before PJS and/or its agents, employees, representatives, and/or subcontractors began flushing and/or testing of the fire suppression system, so the American could have its personnel on hand and/or take whatever precautionary measures it deemed appropriate;

(c)     No tenant coordination plan was established for the flushing and/or testing event so that tenants could make staff available during the event or provide fire watch while branch systems were shut off and/or otherwise isolated;

(d)     No tenant-Port Authority communication plan was established for the flushing and/or testing event so that tenants could communicate problems to the Port Authority and/or PJS and have them addressed;

(e)     failure to properly monitor and/or supervise the flushing and/or testing event that took place on September 20-21, 2012;

(f)     Failure to exercise reasonable care in flushing and/or testing  the subject water mains, water piping, fire hydrants and fire suppression systems, and to perform

such flushing and/or testing in a reasonable and workmanlike fashion, and in accordance with applicable standards, practices and procedures;

(g) failure to exercise reasonable care and take proper precautions to ensure that the manner in which the subject flushing and/or testing was performed would not cause damage to American's leased space and/or facilities, systems, improvements, appurtenances and equipment that American was entitled to use under its Lease Agreement with the Port Authority;

(h) failure to have sufficient and knowledgeable, trained, competent personnel on hand to address any problems that took place during the flushing and/or testing on September 20-21, 2012, including to shut off and/or stop any water discharge resulting from PJS's flushing and/or testing so as to minimize any damages experienced by the Port Authority's tenants, including American;

(i) failure to hire, use and supervise employees, agents, representatives and/or subcontractors with appropriate knowledge, training and experience, who could conduct said flushing and/or testing in a reasonable and workmanlike manner;

(j) failure to shut off service valves and/or otherwise isolate or bypass branch lines, and/or take other precautionary steps, so that flushing and/or testing of the systems would not cause damage to American's two Hangar 5 fire suppression systems; and

(k) other negligent acts and/or failures to act to be determined during discovery.

81. As a direct and proximate result of the aforementioned negligence of Defendant PJS, American sustained and continues to sustain the losses and Damages set forth in paragraph 38 above.

**WHEREFORE**, Plaintiff demands judgment against Defendant in an amount in excess of $75,000 in damages, together with fees, costs and any other relief this Court deems just and proper.

## COUNT V– NEGLIGENT WORKMANSHIP OF CONTRACTOR
## PLAINTIFF V. PAUL J. SCARIANO, INC.

82.     Plaintiff incorporates by reference the previous allegations as if set forth fully at length herein

83.     The water mains, water piping, fire hydrants, sprinkler systems, equipment and fire suppression and water systems involved in the above-described flushing and/or testing on September 20-21, 2012, were repaired, replaced, constructed and/or part of related work by PJS pursuant to its contract with the Port Authority.

84.     At all relevant times, the water mains, water piping, fire hydrants, sprinkler systems, equipment and fire suppression and water systems involved in the above-described flushing and/or testing on September 20-21, 2012, were under the control of and/or were being used, operated, tested, flushed, inspected, augmented, manipulated and/or affected by PJS and/or agents, employees, representatives and/or subcontractors of PJS.

85.     In conducting the flushing and/or testing of the above-described water mains, water piping, fire hydrants, sprinkler systems, equipment and fire suppression and water systems, PJS owed American a duty to perform its construction and related services in a workmanlike manner, especially because PJS had knowledge that failure to do so would cause damage to tenant-leased space at LGA (including American's Hangar 5 leased space) as well as all ancillary facilities, systems, appurtenances the American had a right to use at LGA.

20

86.     As more fully described above, PJS and/or agents, employees, representatives and/or subcontractors of PJS failed to perform construction and related services in a workmanlike manner.

87.     As a direct and proximate result of the failure of PJS and/or its agents, employees, representatives and/or subcontractors to perform construction and related services in a workmanlike manner, Plaintiff sustained and continues to sustain the losses and Damages set forth in paragraph 38 above.

**WHEREFORE**, Plaintiff demands judgment against Defendant in an amount in excess of $75,000 in damages, together with fees, costs and any other relief this Court deems just and proper.

## COUNT VI– CREATION OF UNREASONABLY DANGEROUS CONDITION BY CONTRACTOR

### PLAINTIFF V. PAUL J. SCARIANO, INC.

88.     Plaintiff incorporates by reference the previous allegations as if set forth fully at length herein

89.     The water mains, water piping, fire hydrants, sprinkler systems, equipment and fire suppression and water systems involved in the above-described flushing and/or testing on September 20-21, 2012, were repaired, replaced, constructed and/or part of related work by PJS pursuant to its contract with the Port Authority.

90.     At all relevant times, the water mains, water piping, fire hydrants, sprinkler systems, equipment and fire suppression and water systems involved in the above-described flushing and/or testing on September 20-21, 2012, were under the control of and/or were being

used, operated, tested, flushed, inspected, augmented, manipulated and/or affected by PJS and/or agents, employees representatives and/or subcontractors of PJS.

91.     In conducting the flushing and/or testing of the above-described water piping and fire systems, PJS owed American a duty to perform its construction and associated services in a manner that would not create an unreasonably dangerous condition.

92.     As more fully described above, PJS's construction and associated services created an unreasonably dangerous condition for American from the time there were pipe breaks, leaks and/or failures caused to American's two Hangar 5 fire suppression systems until the time that American put in place fire watch services for Hangar 5.

93.     As a direct and proximate result of PJS's construction and associated services and PJS's creation of an unreasonably dangerous condition as described in the preceding paragraph, American sustained and continues to sustain the losses and Damages set forth in paragraph 38 above, including but not limited to American having to secure 24 hour in-person fire watch services for Hangar 5 to protect personnel and property.

**WHEREFORE**, Plaintiff demands judgment against Defendant in an amount in excess of $75,000 in damages, together with fees, costs and any other relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, Plaintiff American Airlines, Inc. demands a trial by jury of all issues so triable.


Dated:  September 18, 2014

s/James J. Quinlan

**BLANK ROME LLP**
A Pennsylvania LLP
STEPHEN M. ORLOFSKY, ESQUIRE
New Jersey Resident Partner
ELAINE SOLOMON, ESQUIRE
JAMES J. QUINLAN, ESQUIRE
301 Carnegie Center, 3rd Floor
Princeton, NJ 08540
Phone:  (609) 750-7707
Fax:  (609) 897-7395
E-Mail:
**SOLOMON@BLANKROME.COM**
**QUINLAN@BLANKROME.COM**

*Attorneys for Plaintiff, American Airlines, Inc.*

23

# LOCAL CIVIL RULE 11.2 CERTIFICATION

Plaintiff American Airlines, Inc. hereby certifies that, to its knowledge, the matter in controversy in this action is not subject to any other pending lawsuit, arbitration, or administrative proceeding.

Respectfully submitted,

Dated:  September 18, 2014

s/James J. Quinlan

_____

**BLANK ROME LLP**
A Pennsylvania LLP
STEPHEN M. ORLOFSKY, ESQUIRE
New Jersey Resident Partner
ELAINE SOLOMON, ESQUIRE
JAMES J. QUINLAN, ESQUIRE
301 Carnegie Center, 3rd Floor
Princeton, NJ 08540
Phone:  (609) 750-7707
Fax:  (609) 897-7395
E-Mail:
**SOLOMON@BLANKROME.COM**
**QUINLAN@BLANKROME.COM**

*Attorneys for Plaintiff, American Airlines, Inc.*